UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DARLA KAY WHITE,

      Plaintiff,                                   Case Number 10-11385

v.                                           Honorable Thomas L. Ludington

THE STANDARD INSURANCE COMPANY,
a foreign Corporation and
SECURITY FIRST ASSOCIATED
AGENCY, INC., a Michigan Corporation,

      Defendants.

_____/

**OPINION AND ORDER GRANTING SECURITY FIRST'S MOTION FOR SUMMARY
JUDGMENT, GRANTING STANDARD INSURANCE COMPANY'S MOTION FOR
JUDGMENT ON THE ADMINISTRATIVE RECORD, DENYING PLAINTIFF'S
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD, AND
DISMISSING PLAINTIFF'S CLAIMS WITH PREJUDICE**

On April 7, 2010, Plaintiff Darla Kay White filed a complaint (ECF No. 1) against The

Standard Insurance Company ("Standard") and Security First Associated Agency ("Security First").

Security First was Plaintiff's employer during the time period relevant to the complaint. Security

First purchased a group disability policy for its employees including Plaintiff from Standard

Insurance. Plaintiff's complaint originally included five counts alleging claims of Employee

Retirement Income Security Act ("ERISA") violations against both Defendants as well as claims

of discrimination and retaliation arising under the Americans with Disabilities Act ("ADA") against

Security First. Plaintiff's second count seeking injunctive relief under ERISA § 502(a)(2)(3) and

Plaintiff's fifth count alleging an ERISA fraud claim were subsequently dismissed by stipulation of

the parties.

Security First filed a motion for summary judgment on May 12, 2011, (ECF No. 32),

contending that Plaintiff's claims of discrimination and retaliation under the ADA should be

dismissed because at the time her employment was terminated, she was given the ability to seek reinstatement if and when she were able to perform her full-time duties. Plaintiff, however, did not seek reinstatement; she requested that her job be restructured. Security First contends that Plaintiff's request for restructuring her job to have less than a full-time presence does not implicate reasonable accommodation because her full-time presence was an essential function of her job. Plaintiff disputes Security First's assertion, and contends that it could have accommodated her circumstance and further responds that Security First retaliated against her for making the request for accommodation. Plaintiff also contends that Security First did not comply with the ERISA standards regarding Security First's "return to work" accommodation process.

Plaintiff and Standard also filed cross-motions for judgment on the administrative record (ECF Nos. 33, 38) on May 12, 2011. The factual portions of the opinion are separated below in order to address the different periods of time related to Plaintiff's two claims as well as the administrative standard of review applicable to ERISA claims.

A hearing was conducted on August 17, 2011, to address the parties' motions. For the reasons provided herein, Security First's motion for summary judgment will be granted, Standard's motion for judgment on the administrative record will be granted, and Plaintiff's motion for judgment on the administrative record will be denied.

## I.   Facts

### A.   Plaintiff's Employment with Security First

Plaintiff holds an agency license for property and casualty insurance and is a Certified Insurance Service Representative. Plaintiff began work in the insurance industry in 1998, working for Frankenmuth Mutual Insurance for two and a half years. She then worked for several years at

Saginaw Bay Underwriters before starting at Security First in 2003. Plaintiff, at all times relevant, was employed as a full-time Customer Service Agent ("CSA") assigned to Security First's commercial lines department. Plaintiff had experience with trucking lines. She had no experience in handling personal lines insurance for Security First or any other insurance agency. As Plaintiff acknowledged at her deposition, it was desirable and beneficial to Security First's customers to have a single CSA manage each account for continuity purposes. ECF No. 32 Ex. 2 at 22. There were fifteen customer service agents at Security First in 2007-2008.

While at Security First, Plaintiff was working with three different producers concurrently and received satisfactory or superior performance reviews. Plaintiff also received merit pay increases as part of her compensation. Plaintiff was considered an "hourly" worker, which entitled her to receive fringe benefits such as sick leave and vacation time. In 2007, Plaintiff had accrued 176 vacation hours for the year which could not be carried over to the following year. Customer service agents at Security First were permitted to take time off without pay if they had exhausted all of their paid vacation or personal time.

### 1.    Plaintiff injures her back

In September of 2007, Plaintiff sustained a back injury that was not related to her employment. On September 17, 2007, Plaintiff experienced back pain and was treated by her chiropractor who indicated that she needed to consult with her physician regarding her pain. Plaintiff consulted her family physician, Dr. Scott Beasecker, on September 20, 2007. Dr. Beasecker prescribed muscle relaxers and pain medication along with ordering her off work to rest for several weeks.

Plaintiff took the prescribed muscle relaxers and pain medications and rested, but she

continued to experience pain in her back. Plaintiff's manager, Lisa Williams, was on leave beginning the week of September 30, 2007. Plaintiff sent an email to Williams on September 21, 2007 requesting a foot rest at her desk. Plaintiff purchased the foot rest and was reimbursed by Security First.

### 2.    Plaintiff is off work and receives short-term disability benefits

On September 26, 2007, Dr. Beasecker ordered Plaintiff off work until October 11, 2007 along with a no bending/lifting restriction as a result of magnetic resonance imaging ("MRI") performed on or about September 25, 2007.  Plaintiff notified Security First's employees of her two-week leave by email on September 26, 2007. Plaintiff was unable to return to work on October 11, 2007 and was then placed on short-term disability ("STD") pursuant to a benefit policy purchased by Security First for its employees. The policy was administered by Standard Insurance and Plaintiff was referred to Security First's human resources Administrator, Karen Goodrich, regarding her inquiries about the disability insurance coverage and about returning to work. Goodrich later informed Plaintiff, in response to her inquiry, that Standard Insurance did not have a "return to work" form for Plaintiff to submit directly to Standard and that, as a result, Security First was to report Plaintiff's hours to Standard once Plaintiff returned.

Plaintiff's back pain continued through the month of October 2007. She notified Security First that her medical leave needed to be extended into November while she continued with her physical therapy three times per week. The physical therapy prescribed for Plaintiff was not, however, alleviating her pain and, therefore, Dr. Beasecker was unwilling to authorize her to return to work until she could consult with a surgeon, which did not take place until December 10, 2007.

**3.     Plaintiff returns to work part-time contemplating a return to full-time employment**

Plaintiff's STD benefits were set to "max out" on December 24, 2007. Plaintiff was released to return to work on a temporary, part-time basis by Dr. Beasecker on or about December 13, 2007, with the restriction that she could work no more than four hours per day along with no bending or lifting beyond fifteen pounds. Dr. Beasecker testified that he supported Plaintiff's effort in December 2007 to return to work part-time, and was aware that she performed clerical work that did not involve significant heavy lifting or other physical demands. Dr. Beasecker also testified that he had hoped Plaintiff's part-time work would only be for a couple months before returning to full time work.

Accordingly, Plaintiff requested to return to work on a temporary part-time basis with Dr. Beasecker's restrictions. Plaintiff's restriction and request for part-time reinstatement presented a unique situation for Security First as they had never employed permanent CSA's part-time. Security First CEO, Thomas Cowan, testified that Security First decided to make an exception and temporarily accommodate Plaintiff's request for part-time employment because Cowan considered her an important employee. The Security First Board of Directors approved Cowan's request for Plaintiff to work part-time on January 30, 2008, after Plaintiff had already been working part-time for over a month. Plaintiff's manager informed her that returning to work part-time, even on a temporary basis, is something that had never occurred at Security First but that Security First was short-staffed at that time. Security First agreed to allow Plaintiff to return to work part-time for approximately six weeks. Security First's decision was in part based upon the fact that Plaintiff had informed Security First that she hoped to be capable of full-time work in early 2008, but could not be sure until her January 14, 2008, doctor's visit.

-5-

### 4.    Plaintiff is advised her long term disability benefits will terminate
### with her return to work

Plaintiff's part-time employment required her to convert her STD, which expired on December 24, 2007, to a long-term disability ("LTD") benefit to subsidize her reduced income. Plaintiff was notified by Standard Insurance on January 29, 2008, that her LTD was set to expire on February 11, 2008. Standard Insurance indicated that the reason for the February 11, 2008, expiration date was that they were advised by Plaintiff's doctor that she should be able to return to full-time work by that date.  Standard Insurance also stated that, in the event Plaintiff was unable to work after February 11, 2008, because of medical reasons, she would have to have her physician complete a "Physician's Report – Musculoskeletal" that she was provided.

Approximately one month into Plaintiff's temporary, part-time return-to-work, she notified Williams that her restriction was being extended by her physician because she was going to begin treatment at a pain clinic in three weeks. Williams expressed concern that her staff and customers found it difficult working with a part-time CSA in the trucking lines department. Williams testified that she had several debates regarding Plaintiff's part-time work because Plaintiff was a good employee but that she had been advised that the part-time work was a temporary accommodation that would not be extended past her January 14, 2008 doctor's visit.

On January 15, 2008, Security First Producer / Agent, Ralph Clifton sent an email regarding his concern that the trucking accounts that Plaintiff was exclusively assigned to handle were suffering as a result of Plaintiff working part-time. He complained that Plaintiff was unable to adequately complete her job duties and responsibilities. He reported that Plaintiff's work arrangement was breaking continuity between Security First and their customers. Plaintiff was unaware that any complaints regarding her work had been made until she received her personnel file

after her termination

In addition to the concerns being expressed by Clifton and Williams, Plaintiff had her own concerns about her performance and ability to work part-time. Plaintiff had a meeting with Williams around January 1, 2008, regarding her employment at Security First. Plaintiff indicated that she was concerned she would be unable to work the hours required to return to full-time status but was also concerned about the possibility of losing her employment benefits if she remained part-time. ECF No. 32 Ex. 2 at 137-38. Williams relayed Plaintiff's concerns via email correspondence to Cowan on January 15, 2008. ECF No. 32 Ex. 19.

Plaintiff's co-workers had also voiced concern regarding Plaintiff's performance. On January 22, 2008, fellow CSA Dorothy Bemis directed an email to Williams detailing how Plaintiff's part-time schedule affected the trucking department. ECF No. 32 Ex. 20. Although Plaintiff disagreed with many of the concerns raised by her superiors and co-workers, she did acknowledge at her deposition that not being available for the complete workday was detrimental since she was the sole agent assigned to those accounts. ECF No. 32 Ex. 2 at 163-64.

Plaintiff's temporary, part-time employment was extended by Security First until after her doctor's appointment scheduled in early February 2008. However, from January 15, 2008, to February 8, 2008, Plaintiff was having difficulty completing the part-time hours due to her ongoing pain. Dr. Beasecker described Plaintiff as being "unsuccessful" in her attempt to return to work during her eight-week restricted hours period. ECF No. 32 Ex. 13 at 39. During this period, Plaintiff's time records indicate that she did not come in to work on two occasions and left work before meeting her four-hour restriction on another four occasions.

Plaintiff's intermittent attendance continued in February 2008 when she left early on

February 6, 2008, due to a back spasm and then called in sick on February 7, 2008. Plaintiff met with Williams, Goodrich, and Security First board member John Searles on February 8, 2008. Plaintiff's employment was terminated during the meeting. Goodrich recorded details surrounding Plaintiff's termination meeting in a March 25, 2008 memorandum. ECF No. 35 Ex. 22. Goodrich later testified that she was unaware at the time of the meeting that a decision to terminate Plaintiff's employment had been made and that she had not been asked for any input before the decision was made.

Plaintiff testified that Searles cited her inability to work full-time and properly accommodate Security First's clients. ECF No. 35 Ex. 2 at 177. Searles also noted that he had personal experience with a back injury requiring surgery and thought that Plaintiff should not be working. ECF No. 41 Ex. B at 29. Plaintiff was advised that, should her medical condition allow her to return to work full-time, her position would be available for her to return until the end of March 2008. ECF No. 35 Ex. 2 at 177-78. Although Security First did not continue to pay Plaintiff's wages, it did maintain her premiums to Standard Insurance for Plaintiff's LTD coverage. Goodrich testified that Plaintiff's position had not been filled by a new employee, but her customers were spread out amongst the remaining representatives in the commercial lines department. ECF No. 41 Ex. B at 27.

### 6.    Confusion over being unemployed but eligible over LTD

On March 15, 2008, Plaintiff's husband received an email from Plaintiff's former work email address stating that Plaintiff "is on permanent disability as of February 8, 2008" and to contact the agency for any insurance needs. The email was signed by "Security First Insurance." As a result of what Plaintiff believed was an inconsistency between her employment being terminated and the email stating she remained entitled to the disability benefit, Plaintiff wrote a joint letter to Standard

-8-

Insurance and Security First requesting that they resolve whether she was eligible for LTD or had been terminated.  She did not receive a response.

### 7.    Plaintiff is considered disabled

Plaintiff did not request that she be able to return to her full-time duties, nor did she make any representation to Security First that she could return to work full-time. ECF No. 35 Ex. 2 at 182-83.  Dr. Beasecker considers Plaintiff to be totally and permanently disabled and did not extend Plaintiff's temporary work restrictions beyond the initial 6-8 week trial period. ECF No. 35 Ex. 13 at 27.  Based on Plaintiff's inability to work, she was awarded Social Security Disability benefits in May of 2010.  ECF No. 35 Ex. 23.  The Social Security Administration found that Plaintiff was disabled retroactive to her injury in September of 2007. ECF No. 35 Ex. 23.

Plaintiff did not provide Standard Insurance with documentation that would otherwise evidence that she was unable to work in any capacity despite Standard Insurance notifying her that her LTD would be terminated based on their belief that she could perform the requirements of her job while self-managing her pain.  Plaintiff later attempted to work for a brief period of time from July 7, 2008 to August 7, 2008 at another company, Morley, in a clerical setting and did so without requesting an ergonomic assessment. ECF No. 35 Ex. 2 at 233.  Plaintiff never contacted Security First requesting reinstatement to her former position. ECF No. 35 Ex. 2 at 235. Plaintiff stopped working for Morley when she was hospitalized for pneumonia and exhaustion and indicated that trying to return to work was an unsuccessful endeavor. ECF No. 35 Ex. 2 at 236.  Other than the one month period referenced above, Plaintiff has been continuously off work for over three years as a result of her disability.

### B.    Plaintiff's ERISA Administrative Record

### 1.    Plaintiff's Short-Term Disability Claim

As a benefit of her employment with Security First, Plaintiff participated in its employee welfare benefit plan (the "Plan"), which provides long-term disability insurance to eligible employees.  Standard is the Plan's claims administrator and insurer.

Plaintiff awoke with lower back pain with no apparent cause on September 18, 2007.  Less than two weeks later, Plaintiff filed a claim for short-term disability benefits, claiming her back pain prevented her from working. Plaintiff's application was accompanied by an "Attending Physician's Statement" from Plaintiff's primary care physician Scott Beasecker, M.D., which stated that he had diagnosed Plaintiff with sciatica and a "good" prognosis for improvement. Admin. Rec. 00492. Sciatica is a short-term symptom of another medical condition, and is a description of pain, numbness or tingling radiating in the leg with an anticipated recovery of approximately one month. Plaintiff's application was approved on October 16, 2007, and subject to documentation being provided in the event the estimated return to work date would extend beyond October 23, 2007. Admin. Rec.0093-95. Standard's letter informed Plaintiff that her benefits could continue for a maximum benefit period of 76 days under the short term disability policy. Standard provided Plaintiff an attending physician's form entitled "Ortho/Neuro Questionnaire" to be completed in the event her claim needed to be extended.  At various times Plaintiff's physicians provided Standard with diagnosis of a condition of disability which included but were not limited to sciatica, radiculopathy, and lumber radiculopathy. At all times, the short-term disability claim was considered satisfactorily presented and benefits paid pursuant to the definition in the policy.

In a November 15, 2007 medical questionnaire, Dr. Beasecker opined that he expected

Plaintiff to turn to full-time work by January 28, 2008. Plaintiff's physical therapy records reflect that between October 15, 2007, and November 1, 2007, she increased her range of motion in her back, increased her ability to sit and stand, and significantly decreased muscle spasms.

Dr. Beasecker released Plaintiff to return to part-time work as of December 18, 2007 for six to eight weeks, and stated that the six to eight week period was for Plaintiff's gradual recovery to full-time work. Dr. Beasecker limited Plaintiff to being able to sit for four hours, stand for one hour, and walk for one hour. Admin. Rec. 00470.  Plaintiff was also restricted to lifting and carrying up to twenty pounds. There was no limitation placed on Plaintiff's ability to repetitively grasp, push or pull, or perform fine manipulation such as typing. Plaintiff's short-term disability claim expired on December 24, 2007, and converted to a long-term disability ("LTD") claim for purposes of further administration of benefits. Based on Dr. Beasecker's assessment, Standard  approved Plaintiff's LTD claim through February 11, 2008—Plaintiff's expected return to full-time work based on Dr. Beasecker's release for part-time work. The letter notifying Plaintiff that her benefits were approved also included a "Musculoskeletal Attending Physician's Form" enclosure and advised that the form needed to be completed and returned if Plaintiff was unable to return to full-time work after February 11, 2008. Standard calculated Plaintiff's pre-disability actual earnings at $3,246.26 monthly and Plaintiff's "80% PDE" (monthly Pre-disability Earnings) at $2,597.01 per month. Admin. Rec. 00814. Standard also requested a job description from Security First, which Security First provided. Admin. Rec. 00804-807. At that juncture, Plaintiff's earnings were less than that which would qualify her for disability under the "unable to earn" definition in the policy.

### 2.    Plaintiff's Long-Term Disability Claim

On February 8, 2008, Standard was notified by both Plaintiff and Security First that

Plaintiff's employment had been terminated. Standard's file reflects it received the following

incoming call from Karen at Security First: "regarding what to do if clmnt is not able to work full

time . . ." The entry was made by Heather Smith at Standard. Admin. Rec. 00728. A note from Diane

Crawford dated February 8, 2008 at 9:39 a.m. states the following:

> Voice mail from Karen Goodrich 810.732.5800. Ms. White will no longer be working part
> time appears to be in severe pain. They need to have someone who can do the job full time.
> Diane
>
> I spoke w/ Ms. White. She wanted to let me know she had been fired today. She stated she
> had severe pain on Wednesday and had to stay home yesterday. 10 minutes b/4 she was to
> go home today, they called her into the office and terminated her. She was really blindsided.
> She has her second injection on Monday 2/11/2008 and will see Dr. on 2/13/2008. I tried to
> explain that we would need medical information to support she was unable to perform
> sedentary level work activities. If she is able to work full time, it does not matter that she
> doesn't have a job to return to. Ms. White was tearful and didn't understand. Diane

Admin. Rec. 00729. Security First also noted in an internal memorandum that it gave Plaintiff until

the end of March 2008 to return to work full-time, but Plaintiff responded that she felt she was being

let go.

On February 12, 2008, Plaintiff had Dr. Beasecker fax the Physician's Report -

Musculoskeletal that had been included in Standard's January 29, 2008, correspondence to Plaintiff.

Admin. Rec. 00460-462.The musculoskeletal report portion completed by Plaintiff indicated she was

prevented from working full time and had returned to work four hours per day. The portion

completed by Dr. Beasecker indicated he had last seen Plaintiff on February 8, 2008. Dr. Beasecker

noted Plaintiff's primary diagnosis as sciatica, and that there were no assistive devices, worksite

medications or other suggestions to facilitate a return to work.  He indicated that Plaintiff could

frequently sit, lift, carry, push, or pull up to ten pounds and that she could occasionally stand, walk,

balance, reach above shoulder level, and lift, carry, push or pull up to twenty pounds. He also stated

-12-

that it was unknown when Plaintiff could be expected to return to work.  Plaintiff's functional capacities remained the same as in Dr. Beasecker's prior questionnaire when he opined that she would be able to return to full-time work in six to eight weeks.

Standard consulted a vocational specialist, Jan Cottrell, M.A., C.D.M.S., who prepared a Detailed Job Specialty Report identifying the duties and physical demands of an "insurance clerk; insurance customer service representative," which Cottrell opined matched Plaintiff's Own Occupation based on the Department of Labor's Dictionary of Occupational Titles.  Standard determined that Plaintiff's functional capacities, as assessed by Dr. Beasecker, satisfied the functional demands of her Own Occupation as an insurance customer service representative.

On February 20, 2008, Crawford advised Plaintiff that Standard would not change it's decision to close Plaintiff's LTD claim as of February 11, 2008, the estimated date when Plaintiff could return to full-time work. The letter stated that based on the limitations and restrictions provided by Dr. Beasecker, Plaintiff was able to perform sedentary work activities as required by her Own Occupation.

### a.   Plaintiff requests review of Standard's decision to deny LTD benefits

On March 26, 2008, Plaintiff requested that Standard review its decision to close her long-term disability claim.  She submitted a "Physician's Report - Muscoloskeletal" completed by her pain management physician, Dr. Michael Papenfuse, D.O. The form was dated March 17, 2008. Dr. Papenfuse also opined that Plaintiff could "frequently" sit, and "occasionally" lift, carry, push, or pull up to ten pounds. He also opined that Plaintiff could continuously sit for forty-five minutes, continuously stand for twenty minutes, and continuously walk for ten minutes.  Dr. Papenfuse further noted that Plaintiff could return to work if she were provided an ergonomic assessment for

a "sit stand workstation." Admin. Rec. 00457. Plaintiff had also previously sent letters to Standard disagreeing with their decision to close her LTD file as of February 11, 2008, advising Standard that she had arranged for submission of medical records directly from her numerous providers, and noting that she had not been given specific directions as to what documentation Standard required in order to document that Plaintiff was unable to work full-time in her occupation.

On April 17, 2008, Standard received Plaintiff's medical records from Dr. Papenfuse, including: (1) a January 23, 2008, hip x-ray, in which Plaintiff's hips were found to be normal (Admin. Rec. 00345); (2) epidural injection reports called "operative reports" (Admin. Rec. 00325-330, 00349-354); (3) Dr. Papenfuse's physical examination records dated January 22, 2008, March 12, 2008, March 26, 2008, and April 9, 2008, Admin. Rec. 00332-339; and (4) a physical therapist's functional capabilities assessment dated March 6, 2008. Admin. Rec. 00346-348.

Dr. Papenfuse's January 22, 2008, physical examination noted Plaintiff's subjective complaints of pain in the right thigh, and numbness and tingling in both lower extremities. Plaintiff complained that her back pain worsened when lying down or sitting in a straight-back chair, but stated that she felt relief when leaning forward or reclining while seated. Admin. Rec. 00340. Dr. Papenfuse opined that Plaintiff's left lower extremity pain demonstrated an L4 pattern. Admin. Rec. 00343. Dr. Papenfuse diagnosed Plaintiff with chronic low back pain secondary to a herniated nucleus pulposus at L5-S1 and disc bulge at L4-L5 based on a September 25, 2007, MRI of her lumbar spine. Admin. Rec. 00343. Dr. Papenfuse recommended epidural injection nerve blocks at the L4 area of the lumbar spine. Dr. Papenfuse also recommended that Plaintiff quit smoking, but Plaintiff "stated she is not ready to consider that." Admin. Rec. 00343.

On March 6, 2008, Dr. Papenfuse referred Plaintiff to Daniel Peterson, a physical therapist,

to assess Plaintiff's functional capacities. Mr. Peterson noted that Plaintiff can perform "static sitting" without shifting positions for 45 minutes at a time, or less than six hours of static sitting cumulatively in an eight-hour work day, and standing or walking less than three hours cumulatively in an eight-hour work day. Admin. Rec. 00347. Mr. Peterson noted that Plaintiff demonstrated the ability to frequently reach forward, reach above her shoulder, or perform gross manipulation (handling activities), and constantly perform fine manipulation (fingering activities). Plaintiff also demonstrated the ability to occasionally bend, squat, kneel, crawl, or climb, but Mr. Peterson advised that these activities should be avoided. Admin. Rec. 00347-348.

At Plaintiff's next examination on March 12, 2008, Richard Lingenfelter, M.D., reported 70% improvement of Plaintiff's left leg symptoms without any pain, and 20% improvement of her lower back symptoms. Dr. Lingenfelter reduced her pain medication by discontinuing Vicoprofen that had previously been prescribed by Dr. Beasecker and substituting Avinza, "a longer-acting low-dose narcotic." Admin. Rec. 00337. During a March 26, 2008, examination, Dr. Papenfuse noted that Plaintiff's pain was 50% improved with Avinza. He prescribed Lyrica to decrease her symptoms of lower extremity tingling. Admin. Rec. 00335.

At the April 9, 2008, examination, Dr. Papenfuse noted that Lyrica reduced Plaintiff's tingling sensation and only "slight tingling" remained. Dr. Papenfuse opined that overall, Plaintiff's symptoms were 60-65% improved. Plaintiff's only reported side-effect from her new medications, Lyrica and Avinza, was constipation. Admin. Rec. 00332.

Standard also received Dr. Beasecker's medical records for Plaintiff on April 11, 2008. Admin. Rec. 00411-444. Dr. Beasecker diagnosed Plaintiff with sciatica and lumbar radiculopathy. Admin. Rec. 00415, 00418, 00421, 00425, 00428. These records reflect that after Dr. Beasecker

-15-

referred Plaintiff to Dr. Papenfuse, a pain management physician, he became the primary treating physician for Plaintiff's back condition.

Dr. Beasecker's records reflect that Plaintiff also was referred to a neurologist, Mark Jones, M.D., who examined her on December 10, 2007 and March 17, 2008. On December 10, 2007, Dr. Jones opined that Plaintiff's September 25, 2007 MRI showed a "bulging to small disc herniation on the right side at L5-S1" but noted that it did not compress the nerve root, contraindicating Dr. Beasecker's diagnosis of lumbar radiculopathy. Dr. Jones noted only "mild dessication of the disc" and that the disc space heights "are well maintained." Dr. Jones opined that Plaintiff "seems to be making significant improvement" and "should be able to return to work in the next couple of weeks." Dr. Jones recommended that Plaintiff cease smoking "to maintain her disc health" and begin an exercise program consisting of swimming. Admin. Rec. 00441.

At the March 17, 2008 follow-up exam, Dr. Jones opined that Plaintiff's straight leg raising— a test for spinal nerve pain— was negative and she demonstrated "full strength." Dr. Jones noted that Plaintiff's "leg pain ha[d] remitted" following the epidural nerve blocks, and she had "some tingling in the front of the thigh and over the shin" and some pain "in the small of her back." Dr. Jones reiterated his prior recommendation that Plaintiff begin an exercise program such as swimming, but Plaintiff resisted the recommendation. Dr. Jones explained :

> We had talked about getting her into an exercise program such as swimming the last time she was here. She says she [has] no access to a pool. She lives in Birch Run. We talked about that a bit. She then said well it is 20 minutes away. I told her that she needs to do some sort of aerobic type fitness to get over her current constellation of symptoms and [I] think it became clear to her as we talked that she does have access and that she just needs to put forth a little effort to go out and [do] the program.

Dr. Jones concluded, "I think that this is a non-surgical issue for her and should get better with [a] tincture of time and exercises to strengthen her back and belly and good back hygiene." Admin. Rec.

00433.

On April 8, 2008, Security First Human Resources Director Karen Goodrich contacted Crawford to discuss Plaintiff's claim. On April 11, 2008, Plaintiff wrote a joint letter to Standard, Security First, and the Michigan Unemployment agency, requesting that they confer regarding the information in her respective files.

On April 23, 2008, a medical consultant, Dr. Hans Carlson, reviewed Plaintiff's medical record at Standard's request. The consultant report indicates that Dr. Carlson reviewed the available medical records, including Dr. Papenfuse's March 17, 2008 musculoskeletal report. Dr. Carlson did not request an independent medical exam or contact any of Plaintiff's physicians in coming to his conclusions. Dr. Carlson concluded that Plaintiff's condition was lower back pain with lumbar spine degenerative changes without lumbar sacrial radiculopathy and that her reasonable limitations and restrictions would limit her to sedentary level work with no continuous bending, stooping, squatting, twisting or lifting activities. Admin. Rec. 00314-15. Standard's file does not identify Dr. Carlson as a vocational expert or as being familiar with Plaintiff's job history description and his conclusions were not accompanied by any data in the file to reflect what he had been provided.

On May 2, 2008 Crawford wrote an internal memo to the Standard file that stated in pertinent part: "[Plaintiff's] LTD claim closed with our payment through 2/11/2008 as her doctor indicated she could return to work full time 6-8 weeks after return to work part-time." Admin. Rec. 00499. On May 9, 2008 Crawford wrote to Plaintiff that "We have completed our reconsideration of the decision to close your LTD claim with our payment through February 11, 2008 . . . it continues to be our position that your medical records do not provide sufficient documentation of one or more medical conditions with such severity as to prevent you from performing your own occupation after

-17-

February 11, 2008. Therefore your LTD claim will remain closed with our payment due February 11, 2008. . ." Admin. Rec. 00665-71. The letter did not discuss a partial disability claim, Plaintiff's limitations from chronic pain medication, did not provide an analysis that the Plan permits periods of "Temporary Recovery" without prejudicing the claim, nor did it enclose or quote a copy of Dr. Carlson's memorandum. It did, however, inform Plaintiff of her rights under the Plan and ERISA to request an administrative appeal. *Id.*

### b. Plaintiff requests a second review of the decision to deny LTD benefits

Plaintiff did not follow the Plan's appeal procedures but filed a complaint with the Department of Insurance on June 4, 2008. On May 23, 2008, Standard received a faxed letter from Dr. Beasecker, which stated that he believed Standard had misinterpreted Dr. Papenfuse's opinion that Plaintiff could return to work after an ergonomic assessment for a sit-stand work station. The letter stated:

> "This is in response to a communication to Ms. White dated May 9, 2008. . . [A]ll attempts to control her pain and alleviate the symptoms have been unsuccessful to date. . . [Y]ou note the postural tolerance limitation testing and functionable evaluation done by Dr. Papenfuse and our interpreting this as lack of disability since he felt that, with some ergonomical adjustment that she may be able to accommodate some part time work. These ergonomic adjustments have not been done and, as you may know, Ms. White already attempted to work part time and this was unsuccessful. . . [C]urrently the fact that she is requiring the type of pain medication that she takes, in my opinion, makes her totally disabled. These are medications that cause impairment of cognitive ability and functionable ability to do her job and she needs to be off sedating/narcotic pain medications before she is going to able to do her work successfully."

Admin. Rec. 01030. Dr. Beasecker's opinion appears to be in conflict with Dr. Papenfuse's opinion, as he opined at Plaintiff's April 9, 2008 examination that her only reported side-effect from her medication was constipation. Admin. Rec. 00332.

On June 3, 2008, Standard sought a second medical review from Dr. Mark Shih, M.D. The

-18-

request presented five questions including what his conclusion as to Plaintiff's diagnosis, whether the findings support limitations and restrictions from full-time sedentary work beyond February 11, 2008, what reasonable limitations or restrictions would be, whether Dr. Shih agrees with Dr. Papenfuses's March 17, 2008 assessment and whether he agrees with Dr. Beaseker's January 4, 2008 assessment. Dr. Shih reviewed Plaintiff's medical records, including the February 19, 2008 musckuloskeletal report and Dr. Beasecker's March 22, 2008 letter noting that he felt Plaintiff was disabled from her current job. Dr. Shih nonetheless concluded that Plaintiff's diagnosis was chronic low back pain with lumbar degenerative disc disease, and that any diagnosis of sciatica or radiculapathy was unsupported. Admin. Rec. 00292-93. He also agreed with Dr. Papenfuse's assessment that Plaintiff's clinical presentation would allow her to lift/carry, and push/pull up to ten pounds, to sit frequently and to stand/walk occasionally. Admin. Rec. 00290-91.

### c.    Standard denies the LTD claim again

On June 24, 2008, Standard's administrative review office denied reconsideration of Plaintiff's request for reinstatement of LTD benefits stating in part "you reported in your June 4, 2008 letter that you were terminated for missing work . . . because you were not meeting the standards of performance does not show proof of loss of disability. It also does not show your inability to perform your own occupation for another employer in the national economy . . . I can assure you that we have given all your doctor's opinions full and thoughtful consideration." Admin. Rec. 00649-56. Standard also notified Plaintiff that she had exhausted her administrative remedies under ERISA and the Plan.

Shortly thereafter, Dr. Papenfuse sent a letter to Standard that stated:

"Your denial stated Dr. Papenfuse had recommended an ergonomic assessment for a sit and stand workstation and that he indicated [Plaintiff] could frequently sit,

-19-

> occasionally sit/stand and occasionally lift, carry and push-pull up to ten pounds.
> This is not an accurate understanding of this recommendation. . . . Without having
> an ergonomic assessment and having an ergonomic workstation to accommodate her
> restrictions, she would not be able to perform her job. Therefore, where it stated an
> ergonomic or a workstation would be helpful it is incorrect. This is something that
> would need to be done to accommodate her. "

Admin. Rec. 00289. Standard considered the letter and concluded that these issues had been

addressed in the June 24, 2008, letter sent to Plaintiff, and that the content of the letter did not

change their earlier determination to deny Plaintiff's claim.

### 4.   Plaintiff seeks reconsideration of her LTD claim

On December 18, 2008 Plaintiff requested, through counsel, a complete copy of her claim

file. Admin. Rec. 00771. Plaintiff's counsel also provided additional and supplemental medical

records to Standard from August through October 2008 reflecting continuation of Plaintiff's

condition. Admin. Rec. 588. On February 9, 2009, more than seven months after exhaustion of

Plaintiff's administrative remedies, Plaintiff's attorney requested that Standard reconsider its

decision to close her claim. Admin. Rec. 00588-589. Although the Plan provides for only one

administrative appeal and Plaintiff's request was submitted more than seven months after conclusion

of that appellate review, Standard agreed to conduct an additional review of its decision to close

Plaintiff's claim. Admin. Rec. 00587.

Standard again consulted Dr. Shih to evaluate the new medical information provided by

Plaintiff, including reports of epidural injections from August 19, 2008, September 4, 2008, and

September 18, 2008, and a discogram dated October 14, 2008, Admin. Rec. 00253-286, as well as

the letter from Dr. Papenfuse received on June 26, 2008. Dr. Shih reported that the medical evidence

reflected Plaintiff had an annular tear localized to the L4-L5 level. Dr. Shih determined that it would

be reasonable for Plaintiff to alternate between sitting and standing to alleviate discomfort. Dr. Shih

opined, consistent with Dr. Papenfuse, that Plaintiff was capable of 10 pounds of occasional lifting, carrying, pushing and pulling throughout the day, but would require accommodation in a sit-stand work station. Dr. Shih concluded that Plaintiff had the functional capacity for full-time sedentary work. Admin. Rec. 00244-245.

On May 12, 2009, Standard informed Plaintiff of its decision to uphold its determination to close Plaintiff's claim as of February 11, 2008. (Admin. Rec. 00576-582). Standard detailed the medical and vocational evidence considered and the reasons for Standard's determination. Standard again advised Plaintiff that her administrative remedies had been exhausted. On December 9, 2009, nearly two years after Plaintiff's claim closed and coverage terminated, her attorney submitted a "new and separate claim" for disability benefits beginning November 24, 2009. Admin. Rec. 00537-538. On January 8, 2010, Standard notified Plaintiff that because she ceased to satisfy the Plan's definition of disability as of February 11, 2008 and was no longer employed by Security First, her insurance ended and she was no longer a covered Member under the Plan. Admin. Rec. 00507-508. The Plan provision for "When Your Insurance Ends" states that "insurance ends automatically" on "the date your employment terminates." Admin. Rec. 00617.

### 3.   Standard's Policy

The Plan provides a maximum 24-month LTD benefit period if the participant satisfies the "Own Occupation" definition of disability. The policy provides that the insured is disabled if "as a result of physical disease, injury, pregnancy or mental disorder" the insured is "unable to perform with reasonable continuity the Material Duties of [her] Own Occupation." The policy further provides that in the case of Partial Disability, the loss must be of at least 20% in Pre-Disability Earnings when working in [her] Own Occupation. Admin. Rec. 604. The definition of "Own

Occupation" is:

> "[A]ny employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as your regular and ordinary employment with the Employer . . . Material Duties mean the essential task, functions and operations, and the skills, abilities, knowledge, training and experience generally required by employers from those engaged in a particular occupation.

The Policy includes a "Return to Work Incentive" and specifies that your "Own Occupation" is not limited to your job with your employer. Admin. Rec. 00886, 00605. The Plan also provides a "Reasonable Accommodation Expense Benefit" which provides that if the participant is disabled and returns to work in any occupation for any employer, "as a result of a reasonable accommodation made by such employer, [Standard] will pay that employer a Reasonable Accommodation Benefit.

Additional pertinent definitions include:

> PRE-DISABILITY EARNINGS
>
> Your Predisability Earnings will be based on your earnings in effect on your last full day of Active Work unless a different date applies (see the Coverage Features). Any subsequent change in your earnings will not affect your Predisability Earnings. Admin. Rec. 00606.
>
> TEMPORARY RECOVERY
>
> You may temporarily recover from your Disability, and then become Disabled again from the same cause or causes, without having to serve a new Benefit Waiting Period. Temporary Recovery means you cease to be Disabled for no longer than the applicable Allowable period.
>
> A. Allowable Periods
> . . .
>
> 2. During the Maximum Benefit Period: 180 days for each period of recovery.
> B. Effect of Temporary Recovery
> If your Temporary Recovery does not exceed the Allowable Periods, 1 through 5 below will apply.
>    1. The Predisability Earnings used to determine your LTD Benefit will not change.
> 2. The period of Temporary Recovery will not count toward your Benefit Waiting

Period, your Maximum Benefit Period or your Own Occupation Period.
3. No LTD benefits will be payable for the period of Temporary Recovery.
. . .
5. Except as stated above, the provisions of the Group Policy will be applied as if
there had been no interruption of your Disability. Admin. Rec. 00606.

## II.    Plaintiff's Claims Against Security First

### A.    Summary Judgment Standard of Review

A motion for summary judgment should be granted if the movant shows that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A party asserting that a fact cannot be proven or is genuinely disputed must

support the assertion by "showing that the materials cited do not establish the absence or presence

of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the

fact."  Fed. R. Civ. P. 56(c)(1)(B).  The party seeking summary judgment has the initial burden of

informing the Court of the basis for its motion, and identifying where to look in the record for

relevant facts "which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party

who must "set out specific facts showing a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 250 (1986).  If the opposing party fails to raise  genuine issues of fact and the record

indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary

judgment.  *Anderson*, 477 U.S. at 250.

The court must view the evidence and draw all reasonable inferences in favor of the non-

moving party and determine "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson*, 477 U.S. at 251-52.  The party opposing the motion may not "rely on the hope that the

trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The application of Rule 56 extends to employment-related cases, and courts have granted summary judgment for employers in disability discrimination and retaliation cases. *See e.g. Walsh v. United Parcel Serv*., 201 F.3d 718, 724 (6th Cir. 2000) (affirming summary judgment on a disability claim); *Canita v. Yellow Freight System, Inc.*, 903 F.2d 1064 (6th Cir. 1990) (affirming summary judgment on a retaliation claim).

As an initial matter, Security First notes that Plaintiff has filed inconsistent, competing claims against Security First and Standard Insurance. In her claims against Security First, Plaintiff represents that she is capable of working, albeit with her view of what a reasonable accommodation is. Security First contends that the record evidence of the case indicates otherwise. On the other hand, Plaintiff argues that Standard Insurance owes her LTD benefits because her disability and inability to work has continued beyond the LTD cutoff date of February 11, 2008. Plaintiff has been deemed fully and totally disabled by the Social Security Administration and, therefore, is unable to work in any capacity. Since Plaintiff is asserting that she is a disabled person, Security First contends that she is estopped from making an ADA claim. *Butler v. Village of Round Lake Police Dept.*, 585 F.3d 1020 (7th Cir 2005) ("[A] person who applied for disability benefits must live with the factual representations made to obtain them, and if these show inability to do the job then an ADA claim may be rejected without further inquiry."). Security First argues that it is entitled to summary judgment because the undisputed evidence suggests that Plaintiff has pursued this claim

-24-

because she is permanently disabled.

Plaintiff responds that she preferred to retain her employment, even if that meant only limited partial disability benefits and is thus not presenting opposite theories as was the case in *Butler*. Even though she represented to her disability insurer that she was disabled, the policy encourages a return to work and a return to work does not deprive one of disability insurance eligibility so she could have continued receiving partial benefits. An application for disability benefits, partial or total, she contends does not absolve an employer of its duty to reasonably accommodate an employee who desires to perform the work with appropriate and reasonable accommodation. Plaintiff explains that she met the definition of disability under Standard Insurance's policy designed to pay total or partial disability benefits and also permit her a gradual return to work with reasonable accommodation. Plaintiff contends that neither Defendant complied with its legal obligations to her in this process, which is required to be "interactive." ECF No. 41 Exs. J and N.

### B.    Discussion

### 1.    Plaintiff's Claims of ADA Discrimination

Plaintiff contends that she was terminated due to her alleged disability relating to her back injury of September of 2007. To establish a prima facie case of disability discrimination under the ADA, a plaintiff must prove: (1) she is an individual with a disability; (2) she is otherwise qualified to perform the job requirements, with or without reasonable accommodation; and (3) she was discharged solely on account of her disability. *Walsh*, 201 F.3d at 724; *see also Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1183-84 (6th Cir. 1996) ("The disabled individual bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable . . . [and] the disabled individual must prove that he or she would in fact be

qualified for the job if the employer were to adopt the proposed accommodation.").

### a. Plaintiff's Ability to Perform the Essential Functions of her Position

Security First contends that Plaintiff cannot fulfill the second prong of her prima facie burden of demonstrating that she is otherwise qualified to perform the job requirements, with or without reasonable accommodation. The ADA's protections extend only to an employee who is a qualified individual with a disability – i.e. "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position such individual holds or desires." 42 U.S.C. § 12112. Security First asserts that Plaintiff does not meet this definition, as she was admittedly unable to meet the requirements of her full-time employment as a CSA. Plaintiff represented in her disability papers that her disabling event occurred in September 2007. ECF No. 32 Ex. 23. After the mandatory five month waiting period, Plaintiff became eligible for Social Security Disability in March of 2008, just weeks after her termination of February 8, 2008. Since being approved for disability benefits from the SSA, Plaintiff has been unable to work in any capacity. Thus, Plaintiff is unable to establish that she was able to fulfill the essential functions of her position. *Townley v. Blue Cross and Blue Shield of Mich.*, 254 F. Supp. 2d 661, 665-66 (E.D. Mich. 2003) (plaintiff's representation in her disability applications and during her deposition that she was unable to work negated any assertion that she was a qualified individual with a disability). Accordingly, Plaintiff is not a qualified individual with a disability.

Plaintiff contends that the question at issue is whether an employee is a "qualified individual with a disability" must be considered in conjunction with the question of whether that individual could perform the essential functions of the position with a reasonable accommodation, including elimination of an essential job function. Plaintiff confusingly states that if the answer to this question

-26-

is "yes" then she is a qualified individual with a disability entitled to protection under the ADA and summary judgment would be improper.

Moreover, Plaintiff submits that Security First has not established that her full-time presence was an essential function of her position.  The only written complaint Plaintiff is aware of is a January 15, 2008 email from Ralph Clifton which stated that if Plaintiff's part-time status were to be continued, the company would need to consider reassigning her accounts to another CSA. Plaintiff contends that this communication demonstrates that there was not any problem with her part-time status accommodation. Instead, Plaintiff characterizes her position as akin to "flexible management functions" that did not require her to be present full-time to respond to her client's phone calls.

Security First, however, is entitled to summary judgment on Plaintiff's ADA claim. The record evidence demonstrates that being a full-time employee is an essential function of the CSA position at Security First. The job description explains that it is a full-time position.  Plaintiff acknowledged at her deposition that she was unable to complete her work during a four-hour day, and other employees were then assigned on a rotating basis to cover her accounts for the other four hours of the day resulting in those employees working overtime to address her assigned accounts. Plaintiff also acknowledged, and Security First reiterates, that the CSA position is a customer-service focused position that requires being available to  customers when they call to respond to or resolve the customer's request.  There has been no evidence presented that Plaintiff's position was a "flexible" position. This is further supported by the fact that Security First recognized the need to reassign all of Plaintiff's accounts to another CSA if she were to continue working part-time. Security First's motion for summary judgment on this claim will be granted.

### b.    Reasonable Accommodation

To satisfy the second element of the prima facie standard, an employee "must establish that a 'reasonable' accommodation is possible, and bears a traditional burden of proof that she is qualified for the position with such reasonable accommodation." *Monette v. Electronic Data Sys. Corp*., 90 F.3d 1173, 1186 n.12 (6th Cir. 1996). The employee's initial burden of articulating a reasonable accommodation need not be onerous. For the purposes of a prima facie showing, the plaintiff must merely "suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Borkowski v. Valley Cent. School Dist*., 63 F.3d 131, 138 (2d Cir. 1995). "The regulations define reasonable accommodation only by example." *Id.* at 136. The examples include "[j]ob restructuring, part-time or modified work schedules, . . . and other similar actions." 34 C.F.R. § 104.12(b)(2).

If the employee establishes that a reasonable accommodation is possible, then the employer bears the burden of proving that the accommodation is unreasonable and imposes an "undue hardship" on the employer. *Monette*, 90 F.3d at 1186 n.12.  When considering undue hardship, the ADA requires the courts to consider the following factors:

> (i) the nature and cost of the accommodation needed under this chapter;
>
> (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
>
> (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
>
> (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity.

-28-

42 U.S.C. § 12111(10)(B). To prove undue hardship, the employer has to show "both that the hardship caused by the proposed accommodation would be undue in light of the enumerated factors, and that the proposed accommodation is unreasonable and need not be made." *Borkowski*, 63 F.3d at 139. The employer, however, does not need to prove that the employee was unqualified. Instead, the employee must bear the burden throughout the litigation of proving that she is qualified. *Cehrs v. Northwest Ohio Alheimers Center*, 155 F.3d 775, 782 (6th Cir. 1998).

Security First asserts that there were no reasonable accommodations which could have rendered Plaintiff qualified for the full-time sedentary work of a CSA. Plaintiff's physician, Dr. Beasecker initially authorized Plaintiff to return to work part-time for four hours a day for six to eight weeks. ECF No. 32 Ex. 12. Dr. Beasecker did not extend Plaintiff's part-time restriction from the initial six to eight week period, but concluded that Plaintiff was unable to work in any capacity due to her inability to manage the pain associated with her condition. ECF No. 32 Ex. 13 at 19, 30. Dr. Beasecker's opinion is consistent with Plaintiff's subjective complaints of pain that otherwise prevented her from returning to work full-time in the time period before and immediately after her termination. ECF No. 32 Ex. 2 at 182-83.

Security First contends that holding Plaintiff's position open for an indefinite period of time would be an objectively unreasonable accommodation under the ADA. *See Walsh*, 201 F.3d at 727 ("[W]hen the requested accommodation has no reasonable prospect of allowing the individual to work in the identifiable future, it is objectively not an accommodation that the employer should be required to provide"). Security First provided Plaintiff an extended leave period from September 17, 2007 until her return to work on a part-time basis on December 17, 2007. She was allowed to work on a part-time basis until her termination of February 8, 2008. After her termination, Plaintiff's

position was maintained for several weeks in the event she was able to return to full-time work. *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995) (reasonable accommodation does not require an employer to wait indefinitely for the correction of a medical condition). Plaintiff did not request full-time reinstatement during this period.

Alternatively, Security First contends that indefinitely meeting Plaintiff's part-time work restriction is likewise an objectively unreasonable accommodation under the ADA. As outlined in her job duties and responsibilities, Plaintiff's position as a CSA was on a full-time basis only. ECF No. 32 Ex. 3. The decision to accommodate Plaintiff's restrictions on a temporary basis until after her scheduled doctor's appointment in February of 2008 was a decision of first impression for the management at Security First but indefinite, part-time employment could not have been accommodated due to the nature of Plaintiff's position. Further, Plaintiff did not, on any occasion, request an extension of her temporary part-time accommodation, attempt to work on a full-time basis, or request reinstatement of her position after her employment was terminated. ECF No. 32 Ex. 2 at 182-83.

Plaintiff has acknowledged that working as a part-time CSA was detrimental to the Security First's customers as well as for her co-workers covering her duties. ECF No. 32 Ex. 2 at 163-64. Plaintiff, in seeking to permanently have part-time employment, effectively requested that an essential function of her position be eliminated or, at the very least, requested that she be allowed to perform only some of her CSA responsibilities. Security First argues that such an accommodation and alteration of the full-time CSA position is not reasonable as a matter of law. *See, e.g.*, *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 380 (6th Cir. 2007) ("A job function is essential if its removal would fundamentally alter the position . . . The inability to attend work can 'fundamentally

alter' a position which requires attendance to perform tasks"); *Lauby v. Swanson*, No. 96-3301, 1997 WL 561334, *4-5 (6th Cir. Sept. 9, 1997) (request for modified part-time work, where no other individuals worked part-time in employee's position, and where only some of the duties would be performed some of the time, was not a reasonable accommodation). Based on the evidence that has been submitted, Security First contends that it is clear that no reasonable accommodation existed as of February 8, 2008 that would have allowed Plaintiff to remain employed, and Security First was not required to create a new part-time position where none previously existed. *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007) (employer not required to create a new position to accommodate disabled employee).

Plaintiff stated at her deposition that an ergonomic assessment was recommended at her March 6, 2008, examination at Matrix Pain Management and she sent notification of the recommendation for an ergonomic workstation to Security First on April 11, 2008—two month after her employment was terminated. ECF No. 32 Ex. 2 at 151-52; Ex. 25. Plaintiff did not request an ergonomic assessment prior to her termination, ECF No. 32 Ex. 2 at 149-50, and the employee bears the responsibility to request the accommodation that they deem reasonable in nature. *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1041, 1046-47 (6th Cir. 1998). Further, the employer is not required to speculate as to the nature and extent of an alleged disability of their employee or their need or desire for an accommodation. *Id.* Even assuming the ergonomic assessment was something that could have been provided before Plaintiff's termination, Plaintiff was unsure that she would be able to perform her job responsibilities even with an ergonomic workstation. ECF No. 32 Ex. 2 at 198, 204.

Security First believes that Plaintiff was provided with all reasonably requested

accommodations. She was authorized to purchase a footrest for her workstation with full reimbursement from Security First. She was granted leave from September to December 2007. She was then given the opportunity to work on a temporary, part-time basis for a period of six to eight weeks based on the representation that she would be working toward full-time employment. Dr. Beasecker approved Plaintiff's return to work on a temporary basis, as well as be approved for LTD with a cut-off date of February 11, 2008. ECF No. 32 Ex. 15. Plaintiff and her physicians did not provide any additional documentation beyond the initial restriction period that would have otherwise extended her temporary part-time restriction or rendered her fully restricted from working. Security First submits that it was Plaintiff's own delay in submitting the appropriate paperwork to Standard Insurance which resulted in her LTD claim to be denied beyond February 11, 2008, and subsequently closed.

Plaintiff contends that, at a minimum, Security First was required to discuss an additional period of leave for her before terminating her employment. *Cehrs v. Nw. Oh. Alheimers Ctr.*, 155 F.3d 775 (6th Cir. 1998) (noting that the court is unsure that there should be a per se rule that an unpaid leave of indefinite duration could never constitute a reasonable accommodation under the ADA). Plaintiff also contends that Security First, in conjunction with Standard Insurance, did not properly confer with respect to Plaintiff's "return to work" accommodation process as required by ERISA because it was "too much of a hassle" to conform with the requirements of the ADA. It is unclear how Plaintiff contends Security First and Standard Insurance should have conferred or how this relates to Plaintiff's ADA causes of action.

Plaintiff appears to be arguing that an additional period of unpaid leave would have been an appropriate accommodation. Indeed, Security First accommodated Plaintiff first by agreeing to six

to eight weeks of part-time work, which resulted in other employees needing to work overtime and the quality of work in Plaintiff's department declining as a whole. Security First then advised Plaintiff that her employment was being terminated, but left open her position should she be able to return to full-time work by the end of March. This provided Plaintiff an additional seven weeks to continue her recovery in order to return to full-time work. Plaintiff did not suggest that an ergonomic workstation accommodation might be helpful until April 2008—after the period of her position being held open had passed. Security First made the reasonable accommodations Plaintiff requested: Security First reimbursed Plaintiff for her foot rest, and after she had been on medical leave for over three months Security First agreed to temporarily accommodate Plaintiff's part-time work restrictions.

It is undisputed that in the five months that Plaintiff was on medical leave or working part-time that she was unable to fully perform the duties of her job, as it was required that other employees cover her duties for half of each day to the detriment of their own work performance. Moreover, Security First did not employ any part-time CSAs, and an employer is not required to create a new position in order to accommodate an individual with a disability that is no longer able to perform the essential functions of her own occupation. *See, e.g.*, *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 380 (6th Cir. 2007) ("A job function is essential if its removal would fundamentally alter the position…The inability to attend work can 'fundamentally alter' a position which requires attendance to perform tasks"); *Lauby v. Swanson*, No. 96-3301, 1997 WL 561334, *4-5 (6th Cir. Sept. 9, 1997) (request for modified part-time work, where no other individuals worked part-time in employee's position, and where only some of the duties would be performed some of the time, was not a reasonable accommodation). As a result, Plaintiff has not demonstrated

-33-

that she was able to perform the essential functions of her job even with reasonable accommodation and Security First's motion for summary judgment will be granted.

### 2.    Plaintiff's Retaliation Claim

Plaintiff's remaining claim against Security First is for retaliation. In order to establish a prima facie case of retaliation under the ADA, Plaintiff must establish: (1) she engaged in a protected activity; (2) Security First took an adverse employment action against her; and (3) there was a causal connection between the protected activity and the adverse action. *Barrett v. Lucent Technologies*, 36 F. App'x 835, 841 (6th Cir. 2002). In the event that Plaintiff is able to meet her burden, she would still have to show that Security First's legitimate, non-discriminatory or non-retaliatory reasons for its actions were pretextual. *Willey v. Slater*, 20 F. App'x 404, 406 (6th Cir. 2001); *Smith v. Chrysler Corp.*, 155 F.3d 799, 808 (6th Cir. 1998) (to prove pretext, plaintiff must establish an employer's stated reasons are "unworthy of credence."). A plaintiff that is claiming retaliation "must establish that the decision complained about as retaliatory would not have been made 'but for' the protected status of the plaintiff." *Canita*, 903 F.2d at 1068. Security First submits that Plaintiff can not meet her prima facie burden let alone establish pretext and, therefore, her claim fails as a matter of law.

Plaintiff alleges that she engaged in a protected activity when she complained about disability discrimination. Security First does not have a record of Plaintiff making a complaint prior to her termination and did not pursue a claim with the EEOC until December 2008. The only other protected activity that Plaintiff alleges in her complaint is that she "informed Security First that the Standard Insurance policy included provisions for reasonable accommodation, which was a protected activity." ECF No. 1 ¶ 63. This protected activity appears to be in reference to Plaintiff's

post-termination April 11, 2008, letter to Goodrich requesting an ergonomic assessment of her workspace because Security First had provided Plaintiff all of her pre-termination accommodation requests.

Plaintiff's claim of engaging in protected activity after her termination is insufficient to sustain a claim for retaliation. At the time of her termination in February 2008, Security First did not know Plaintiff would later file an EEOC claim regarding Security First's failure to provide an ergonomic assessment. Plaintiff also implies that Security First bears some responsibility for the administration of a benefit plan between Plaintiff and Standard Insurance because Security First pays the premiums for their employees to have such coverage. Plaintiff provides no legal authority to support this contention. Because Security First provided Plaintiff with her requested accommodations, and because Plaintiff does not allege that she engaged in any protected activity before her termination, she cannot establish a prima facie case of retaliation.

Even if Plaintiff could established her prima facie case of retaliation, the evidence demonstrates that Security First had legitimate and nondiscriminatory reasons to terminate Plaintiff's employment. Security First complied with all requests made by Plaintiff and her physicians regarding her efforts to return to work full-time. Plaintiff's attendance remained irregular and she was unable to work for the four-hour part-time shift on a number of occasions. Security First decided to terminate Plaintiff's employment because she was no longer able to perform the essential function of her job, which required servicing customer's requests in a high-volume, fast paced environment. A position that would have allowed Plaintiff to perform sedentary work on a part-time basis at Security First was unavailable.

-35-

Plaintiff, however, submits that Security First's legitimate, nondiscriminatory reason to terminate Plaintiff's employment was pretext because she believed her part-time work schedule was sufficient to meet the demands of her position. The record evidence does not support Plaintiff's contention. The record indicates that there were multiple reports of her department's work quality suffering because of her part-time status.  Plaintiff's termination occurred after she had worked approximately eight weeks—the outer limit of the part-time accommodation that Security First had agreed to—and was unable to return to full-time work at that point in time.  Plaintiff's department's struggle to cover her workload during her part-time work tenure is further evidenced by the emails from Plaintiff's manager on January 14, 2008 and January 15, 2008. ECF No. 32 Ex. 16; Ex. 19.

Alternatively, Plaintiff contends that Security First retaliated against her after she expressed an objection over her health insurance quotation. However, Plaintiff complained about her health insurance quotation in the Fall of 2007 before she notified Security First of her back injury. Plaintiff does not explain how her pre-disability complaint regarding health insurance premiums is a protected activity, nor does she explain how Security First's actions were in retaliation for her making the complaint. Security First's motion for summary judgment will thus be granted as to Plaintiff's retaliation claim.

## II.    Plaintiff's ERISA Claim

### A.    Standard of Review for Judgment on the Administrative Record

Generally, federal courts review a plan administrator's decision to deny benefits de novo. *Sanford*, 262 F.3d at 595 (citations omitted).  Where, as here, the plan administrator reserves discretionary authority to determine eligibility and construe policy terms, the more deferential arbitrary and capricious standard of review applies.  *Id.*  Standard's "Allocation of Authority"

included in its policy grants it the "full and exclusive authority . . . to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy." Standard has the "right to establish and enforce rules and procedures," the "right to resolve all matters when a review has been requested," and the "right to determine" the "sufficiency and the amount of information" in determining "entitlement to benefits." Any decision made by Standard "in the exercise of our authority is conclusive and binding." Admin. Rec. 00896.

The arbitrary and capricious standard is "the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (quotation marks and citation omitted). The arbitrary and capricious standard requires courts to review the plan provisions and the record evidence and determine if the administrator's decision was "rational." *Id.* Although the evidence may be sufficient to support a finding of disability, if there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, then the decision is neither arbitrary nor capricious. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). Yet the deferential standard of review does not mean courts should "rubber stamp[]" a plan administrator's decision—a court must review the quantity and quality of the medical evidence on each side. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006). A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from "a deliberate principled reasoning process" and is supported by "substantial evidence." *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).

Deferential review is tempered, however, when a conflict of interest might be apparent justifying more close scrutiny. When the same entity determines eligibility for benefits that is also responsible for paying those benefits out of its own pocket, an inherent conflict of interest arises. In close cases, courts must consider that conflict as one factor among several in determining whether the plan administrator abused its discretion in denying benefits. *Metro. Life Ins. Co. v. Glenn*, --- U.S. ----, 128 S.Ct. 2343, 2345, 171 L.Ed.2d 299 (2008); *De Lisle v. Sun Life Assur. Co. of Can.*, 558 F.3d 440, 444 (6th Cir.2009). Here, Standard's Plan contains language sufficient to grant discretionary authority to Standard to determine eligibility and construe policy terms and the more deferential arbitrary and capricious standard of review applies. However, because Standard decides whether to grant or deny eligibility for benefits and pays benefits and Court must bear in mind that a conflict of interest exists even under the highly deferential arbitrary and capricious standard of review.[1]

---

[1]Plaintiff contends that after *Glenn*, the State of Michigan enacted administrative rules prohibiting insurers from issuing, delivering, or advertising insurance contracts or policies that contain "discretionary clauses." Mich. Adm. Code 500.2201 et seq. Plaintiff asserts that because the Michigan Administrative Code was effective on a date prior to denial of her claim, Standard may not assert its "discretion" under the policy language in this matter such that this Court must defer to Standard. See *American Council of Life Insurers v. Watters*, 536 F. Supp. 2d 811, 819-20 (W.D. Mich 2008). However, Michigan's regulation became effective July 1, 2007, and specifically exempts ERISA plans established prior to the effective date: "This [regulation] does not apply to a contract document in use before that date, but does apply to any such document revised in any respect on or after that date." Mich. Admin. Code R. 500.2202(b). The regulation does not retroactively apply to policies issued before July 1, 2007. *Morrison v. Unum Life Ins. Co. of Am.*, 730 F. Supp. 2d 699, 705 (E.D. Mich. 2010) ("The regulation, by its express language, was to have no application to previously existing contracts containing a discretionary clause."). Standard's Plan has an effective date of November 1, 1996 and was amended on June 1, 1999. (Admin. Rec. 00593, 00595, 00596). Michigan's prospective regulatory prohibition on discretionary clauses effective July 1, 2007 does not apply retroactively to Standard's previously existing 1996 Plan. The Plan's grant of discretionary authority is thus valid, warranting judicial review under the highly deferential "arbitrary and capricious" standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

-38-

A court may consider only that evidence presented to the plan administrator at the time he

or she determined the employee's eligibility in accordance with the plan's terms. The court's review

is thus limited to the administrative record. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d

609, 618 (6th Cir. 1998).

### B.    Discussion

### 1.    Plaintiff's Argument

Plaintiff first submits that, in examining the denial of her claim under an arbitrary and

capricious standard, elements of the standard established in the Eighth Circuit are helpful in

applying the standard. These include (1) whether the administrator's interpretation is consistent with

the goals of the plan; (2) whether it might render some language in the plan meaningless or

internally inconsistent; (3) whether the challenged interpretation is at odds with the procedural and

substantive requirements of ERISA; (4) whether the provision at issue has been applied consistently;

and (5) whether the fiduciary's interpretation is contrary to the clear language of the plan. *Cooper*

*Tire & Rubber Co. v. St. Paul Fire & Marine Ins. Co.*, 48 F.3d 365, 371 (8th Cir. 1995).

### a.    Standard's Response to the LTD Claim[2]

Plaintiff contends that the goal of the Plan is to provide short-term and long-term benefits

---

[2] Plaintiff also asserts in her response to Standard's motion that there are over one hundred pages that have been inappropriately excluded from the Administrative Record which should create a bias against Standard. Plaintiff does not provide any legal authority for this contention. Moreover, Plaintiff did not assert a procedural challenge to the records withheld from production during discovery and Standard provided disclosures for the records in a privilege log because the records contained reports regarding another patient. It would be improper to speculate as to whether the documents may or may not have been appropriately withheld where the argument is raised for the first time in a response brief. *See McCandless v. Standard Ins. Co.*, No. 08-14195, 2011 WL 533590, at *13 (E.D. Mich. Feb. 15, 2011) (rejecting a plaintiff's procedural challenge raised in a response to a motion for judgment).

-39-

for insured individuals in the event they have a medical condition that results in a disability. Plaintiff asserts that Standard's application of the language of the plan to the facts of Plaintiff's case was inconsistent with that purpose and that Standard's refusal to credit reliable evidence is an abuse of discretion under ERISA. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S. Ct. 1965 (2003). Plaintiff believes that Standard not only denied her benefits, notwithstanding medical information supporting the disability, but did so in a way that would prevent her from knowing the reason for the decisions. This, Plaintiff argues, made it impossible for her to challenge Standard's decision. Plaintiff also contends that Standard's review of her second appeal in 2009 was inappropriately conducted by the same consultants that evaluated the first appeal in 2008 and thus had a vested interest in upholding the prior determination.

Moreover, Plaintiff emphasizes that the record reflects that Standard treated its January 29, 2008 decision to close the file as of February 11, 2008, as a denial of further benefits to Plaintiff. Plaintiff believes that this decision is arbitrary because the policy allows an individual to qualify for benefits even if they have returned to work and her medical condition continued to be documented at a level for which Standard had previously approved benefits. Plaintiff also contends that Standard had a duty to communicate with Security First, and Security First had a duty to communicate with Standard for a "Reasonable Accommodation Expense" to ensure that an ergonomic assessment for Plaintiff's workstation would take place.

Plaintiff also seeks to challenge Standard's interpretation of one's Own Occupation because it ignores the language regarding "reasonable continuity." Plaintiff contends that Standard's long term disability plan's definition of "partial disability" is best viewed as a "subset" of "own occupational disability." In other words, participants who are partially disabled and working part-

time also meet the definition of own-occupation disability because working less than full time is not working with reasonable continuity. *See Huberty v. Standard Ins. Co.*, No. 06-CV-2388, 2008 WL 783407, at *1 n.3 (D. Minn. March 25, 2008). Plaintiff does not explain how this argument relates to her total disability claim or the fact that benefits were scheduled to terminate as a result of Dr. Beasecker's projected recovery date. Plaintiff also does not suggest that she had made a request for partial benefits in order to continue working less than full time.

Plaintiff also appears to challenge Standard's denial of her "new and separate" claim in November 2009. In denying this claim, Plaintiff asserts that Standard failed to consider and address that Plaintiff's disability continued from before the date she ceased being a covered Member under the Plan. The Plan provides that if continuation of disability occurs, the insured meets the policy definition of an individual entitled to "Benefits After Insurance Ends or Is Changed." In making this argument, Plaintiff is presumably arguing that her "new and separate" claim is, in reality, a third appeal of Standard's denial of her claim; an appeal to which she was not entitled. If Plaintiff is seeking the Court's review of a new and separate claim, the record does not include any evidence that an administrative appeal was made before seeking judicial review. Review of any new and separate claim would thus not be warranted.

### i.   The Adequacy of Standard's Notice

Plaintiff next asserts that it is impossible for her to determine whether the applicable provisions in the policy were consistently applied. The ERISA claims regulations, as a part of the "minimum requirements for employee benefit plan procedures," require that "claims procedures contain administrative processes and safeguards designed to ensure and to verify the benefit claim determinations are made in accordance with governing plan documents and that, where appropriate,

the plan provisions have been applied consistently with respect to similarly situated claimant." 29

C.F.R. § 2560.503-1(b)(6). ERISA and the Plan specifically require Standard to provide not only

the medical basis for denial of a claim, but also to provide any underlying policies that govern plan

interpretation, including the specific reasons for denial, specific reference to the pertinent plan

provisions on which the denial is based, a description of any additional materials or information

necessary for the claimant to perfect the claim and an explanation of why such material or

information is necessary, and appropriate information as to the steps to be taken if the participant

or beneficiary wishes to submit his or her claim for review.  29 C.F.R. § 2560.503-1(f).

Plaintiff asserts that Standard has not applied the provisions of the Plan in a consistent

manner to similarly situated claimants and has also failed to apply a consistent standard throughout

her claim. Plaintiff believes that Standard acted arbitrarily by citing Dr. Beasecker's original opinion

as its basis for closing her file on February 11, 2008, then later rejecting the same opinion as

providing evidence that Plaintiff was unable to work full-time. *Compare* Admin. Rec. 00725 *with*

Admin. Rec. 01020.  Standard then introduced new rationales in its final denial decision after

Plaintiff's second appeal. Plaintiff also contends that Standard did not consider the information as

requested by Plaintiff and her counsel. More specifically, the LTD file was initially closed because

Standard concluded Plaintiff had not provided documentation to evidence her disability as of

February 11, 2008.  After she did so, and requested further review, Standard relied on its internal

medical reviews which were initiated in April and did not describe the opinions in sufficient detail

to Plaintiff. Plaintiff believes this constitutes a violation of 29 C.F.R § 2560.503(f). *Wenner v. Sun*

*Life Assurance Co. of Canada*, 482 F.3d 878, 882 (6th Cir. 2007) (finding that introducing a new

rationale for the first time in a final decision violates the "full and fair review" where the claimant

is not afforded an opportunity to respond to the second, determinative reason for benefit termination); *see also* 29 U.S.C. § 1133(2); *Abatie v. Alta Health Life Insurance*, 458 F.3d 955, 974 (9th Cir. 2006).

### ii.  Standard's Interpretation is Contrary to the Clear Language of the Plan

As previously noted, the language of the Plan contemplates that a person may be disabled when they can perform the Material Duties of their job, but cannot do so with reasonable continuity. Plaintiff contends that Standard did not consider Plaintiff's ability to perform her job duties with reasonable continuity. Plaintiff argues that the reviews conducted on and after April 2008 were limited in scope, and omitted substantial medical information, and emphasizes that "when a plan administrator's explanation is based on the work of a doctor in its employ, [the Court] must view the explanation with some skepticism." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381-82 (6th Cir. 2005).

Plaintiff also asserts that Standard did not apply the facts in the record to the terms in the Plan, and misstated or misrepresented events and facts in order to justify a denial of the claim. Plaintiff does not fully elaborate where the alleged misstatement or misrepresentations are present in the administrative record, but contends that the "most egregious" example is Standard's June 24, 2008 denial characterizing Plaintiff's statement as her employment being "terminated for missing work," and "not meeting the standards of performance." Admin. Rec. 00655. Plaintiff also contends Standard's intent to deny her claim is further evidenced by Crawford's file note on February 8, 2008, providing that Crawford had advised Plaintiff, upon her notifying Standard that she had been "fired," that if she were able to return to full-time work it was irrelevant for the purposes of her claim if she did not have a job to return to. Admin. Rec. 00729.  Plaintiff does not explain how the file note

evidences discriminatory intent.

Plaintiff believes that Standard distorted the evidence and omitted material information in its summaries to avoid long-term payment. To support this, Plaintiff offers an excerpt from Standard's May 9, 2008, letter where Standard asserts that Dr. Jones, Plaintiff's neurosurgeon, had earlier found her neurologic examination unremarkable and stated that Plaintiff declined an exercise program. Plaintiff also argues that Dr. Jones' letter was not written to comment upon Plaintiff's ability to perform full time work but rather to address her need for surgery. Plaintiff does not explain how this demonstrates that Standard distorted evidence or omitted material facts.

### iii.   Disability Criteria Applied

Next, Plaintiff argues that Standard applied criteria not contained in the Plan in determining whether she was disabled.  Standard focused on whether Plaintiff was able to perform her Own Occupation as a customer service representative and its criteria described in the Directory of Occupational Titles ("DOT"). Standard closed Plaintiff's file based on the projected date she could return to full time work. Plaintiff contends that Standard then erred by not considering the partial disability "unable to earn" definition and erred by evaluating her disability under the DOT exertional strength categories when the relevant definition is the more generous "your own occupation" criteria pursuant to the Plan. *See Gaither v. Aetna*, 388 F.3d 759 (10th Cir. 2004). Plaintiff also believes that the review should not have been limited to a "snapshot" in time of "as of February 11, 2008" but should have encompassed the progression of the disability over the entire relevant period, consistent with the 180-day language in the Plan. Admin. Rec. 00606.[3]

---

[3] Plaintiff requests that the Court consider the SSA's findings but the Court is restricted to the Administrative Record on review.

### b.    Plaintiff's Entitlement to Benefits

### i.    Plaintiff's Limitations Documented by her Physicians

Plaintiff emphasizes that in reporting her physical limitations, Drs. Beasecker and Panenfuse used the forms supplied by Standard. *See, e.g.*, Admin. Rec. 00460-62. A Plan may not summarily reject the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion. *Evans v. Unum Provident Corp*., 434 F.3d 866, 877 (6th Cir. 2006). Plaintiff argues that Standard's conclusion that her treating physicians' diagnosis were not supported by the record evidence was egregious. Admin. Rec. 00665.   Plaintiff also contends that, in its denial letter, Standard did not offer "reasons for adopting an alternative opinion." *Glenn*, 461 F.3d at 466; *Elliot v. Metro Life Insurance Co.*, 473 F.3d 613, 620 (6th Cir. 2006). Plaintiff also believes that Standard ignored the definition of disability contained in its own policy when considering the record evidence, which simply addresses the ability to perform the material duties of a job with reasonable continuity.

### ii.    Absence of an Independent Medical Examination

Plaintiff next contends that the record demonstrates that Standard's primary focus was establishing that Plaintiff's job description involves sedentary work rather than evaluating her actual medical condition through analysis of the medical records, or through an independent medical examination, which Standard could have requested but did not. Plaintiff interprets this as Standard concluding that an insured is not disabled under the Plan if she can perform any sedentary job. Plaintiff notes that in *Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172 (N.D. Cal. 2011), Standard was found to have abused its discretion denying LTD ERISA benefits without conducting "full and fair review" even after requesting and obtaining an IME. In *Oster*, however, the Court also noted

that a full and fair review was not conducted because Standard added new rationales for its denial over a three year period without providing the claimant the opportunity to respond, and did not make any attempt to obtain the claimant's medical records or speak with his physicians even though its decision was not rendered until two years later.

Plaintiff notes that Standard did not use the Dictionary of Occupational Titles to determine the Material Duties of her job until after it decided to close her file on February 11, 2008. According to Plaintiff, Standard's denial does not demonstrate that it evaluated her job description and the medical evaluations it solicited were only concerned with whether her occupational classification was sedentary without regard to the material duties of her job. Plaintiff states that she is also unaware of any evidence in the administrative record reflecting that Standard provided its medical review consultants with an outline of her job's actual material duties at Security First. The medical review consultants instead summarily stated that Plaintiff *should* able to generally work full-time in a sedentary position, which Plaintiff contends is irrelevant.

### iii.   Chronic Pain is Considered a Disabling Condition Under ERISA Plans

Finally, Plaintiff contends that it is also clear that she experienced chronic pain which is a disabling condition under the Plan. Admin. Rec. 00460 (noting that Plaintiff had intractable pain, which was a barrier to returning to work). Plaintiff was treated by her pain management physician with epidural injections in an attempt to manage her pain. Standard instead only acknowledged that Plaintiff had subjective complaints of pain. Admin. Rec. 00655.

### 2.   Standard's Argument

Under ERISA, it is reasonable for an administrator to rely on the expert opinions of consulting physicians who review the medical data. "In such file reviews, doctors are fully able to

evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation." *McCandless v. Standard Ins. Co.*, No. 08-14195, 2011 WL 533590, at *11 (E.D. Mich. Feb. 15, 2011) (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569 (7th Cir. 2006)). However, a "file only review" is a factor in the Court's review. *Smith v. Continental Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006). Standard consulted Dr. Carlson, a physiatrist who specializes in musculoskeletal pain, who reviewed Plaintiff's medical records. Dr. Carlson opined that there was no evidence of a lumbosacral radiculopathy or any significant impairment from a lumbosacral radiculopathy. Dr. Carlson opined that "[r]easonable limitations and restrictions would limit [Plaintiff] to sedentary-level work with no continuous bending, stooping, squatting, twisting, or lifting activities. The ability to reposition periodically from sitting to standing and/or walking would also be reasonable." Admin. Rec. 00310-311. Standard also consulted a second physiatrist, Dr. Mark Shih, who concurred with Dr. Carlson's assessment and opined that the medical evidence did not support a diagnosis of sciatica or lumbar radiculopathy. Dr. Shih further opined that Plaintiff's clinical presentation would allow her to lift/carry and push/pull up to 10 pounds and to sit frequently and stand/walk occasionally. Admin. Rec. 00291. Dr. Shih concluded that the objective and clinical findings were consistent with sedentary work tasks.

Standard contends that its determination is supported by the objective findings and clinical opinions of Plaintiff's neurologist, Dr. Jones, who found no evidence of nerve root compression based on the September 2007 MRI of Plaintiff's lumbar spine. Dr. Jones's MRI findings refute Dr. Beasecker's diagnosis of radiculopathy, a condition characterized by nerve root impingement. On December 10, 2007, Dr. Jones opined that Plaintiff "seems to be making significant improvement"

-47-

and "should be able to return to work in the next couple of weeks." Admin. Rec. 00441. At the March 17, 2008 follow-up exam, Dr. Jones noted further improvement in Plaintiff's condition. Plaintiff's straight leg raising test was normal, she demonstrated "full strength," her "leg pain has remitted," and she only experienced "some tingling in the front of the thigh and over the shin" and some pain "in the small of her back." He also concluded that Plaintiff's MRI showed a small disc herniation that does not compress the nerve. Dr. Jones's overall neurological assessment, which was not limited to a surgical assessment,  was that Plaintiff "should get better with [a] tincture[4] of time and exercises to strengthen her back and belly and good back hygiene." Standard did not construe this opinion as describing a totally disabling back condition but supporting its determination that Plaintiff was not disabled from performing sedentary work after February 11, 2008.

Standard's determination is further supported by Dr. Papenfuse's and Dr. Lingenfelter's clinical findings. On March 12, 2008, Dr. Lingenfelter noted that Plaintiff's left leg symptoms improved by 70%, she no longer experienced left leg pain, and her lower back symptoms improved by 20%. Plaintiff demonstrated further improvement after starting Lyrica and Avinza, low dose narcotics, to replace Dr. Beasecker's prescribed high narcotic, Vicoprofen. On March 26, 2008, Dr. Papenfuse opined that Plaintiff's condition was 50% improved. On April 9, 2008, Dr. Papenfuse opined that Plaintiff was 60-65% improved and only "slight tingling" remained. Admin. Rec. 00332. Standard also agreed with Dr. Papenfuse's opinion that Plaintiff required an ergonomic sit-stand workstation in order to return to full-time work. Admin. Rec. 00289, 00372-74, 00457-59.

---

[4] It is unclear what Dr. Jones meant by a "tincture" of time. "Tincture" can mean either a pigment/tinting substance or to infuse something with a quality, such as color.

Standard believes that its determination is supported by Dr. Papenfuse's functional capacity evaluation, based on testing performed by physical therapist Daniel Peterson. Dr. Papenfuse opined that during a work day, Plaintiff "Frequently" can sit, "Occasionally" can stand or walk, and "Occasionally" can lift, carry, push, or pull up to 10 pounds. Admin. Rec. 00457-59. He opined that Plaintiff can sit for 45 minutes continuously, stand for 20 minutes continuously, and walk for 10 minutes continuously. Admin. Rec. 00457-459. Standard's vocational consultant, Jan Cottrell, determined that these functional capacities are consistent with the physical demands of Plaintiff's Own Occupation as an insurance customer service representative. Admin. Rec. 00725-26. Standard then determined that Plaintiff failed to satisfy the Plan's definition of Disability after February 11, 2008, based on the medical opinions of Drs. Carlson, Shih, Jones, Papenfuse, and Lingenfelter in light of Cottrell's vocational assessment.

Dr. Beasecker, however, disagreed with Standard's benefit decision. In his May 22, 2008 letter to Standard, Dr. Beasecker asserted that Plaintiff was "totally disabled" because Plaintiff unsuccessfully attempted to return to work and had not obtained an ergonomic assessment for a sit-stand workstation as recommended by Dr. Papenfuse. Admin. Rec. 00946. Standard construed Dr. Beasecker's opinion as vocational, not medical, which is outside of his area of expertise. Because the Plan specifies that one's Own Occupation "is not limited to your job with your Employer," if a Plan participant could perform the same occupation for another employer that does provide ergonomic workstations, the participant does not meet the definition of disabled under the Plan.  Admin. Rec. 00604. Standard determined that Dr. Papenfuse's recommendation for a sit-stand workstation was not a barrier to Plaintiff's ability to perform sedentary work and did not necessitate a finding of disability, particularly in light of the Plan's coverage for accommodation expenses.

-49-

Dr. Beasecker also opined in his May 22, 2008 letter to Standard that Plaintiff's pain medication "makes her totally disabled" and that "[t]hese are medications that cause impairment of cognitive ability and functional ability to do her job . . . ." Admin. Rec. 00946. This, however, is refuted by Dr. Papenfuse's examination records where he recorded that as of April 9, 2008, Plaintiff's only reported side-effect from her medication was constipation. Admin. Rec. 00332. Standard perceived Dr. Beasecker's May 22, 2008, letter as acting as Plaintiff's disability advocate rather than as a physician rendering objective opinions. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (acknowledging the well-known propensity for treating physicians to act as disability advocates); *Davis*, 444 F.3d at 578 (observing that the treating primary care physician acted "more as an advocate than a doctor rendering objective opinions"). Dr. Beasecker had examined Plaintiff two times before writing his May 22, 2008 letter, on February 13, 2008 and March 19, 2008, and never mentioned disabling medication side-effects in his medical chart. Admin. Rec. 00414, 00412-13. Dr. Beasecker's opinion of "total disability" in his May 22, 2008 letter was thus discounted as unsupported by Plaintiff's clinical records. *See Maleszewski v. Liberty Life Assur. Co. of Boston*, No. 09-13926, 2010 WL 1416995, at *10 (E.D. Mich. Apr. 8, 2010) ("[A]n opinion by a treating physician that a patient is disabled without explanation of how the physician arrived at that determination is entitled to little weight.").

Standard argues that its determination that Plaintiff was able to perform sedentary work duties of her Own Occupation after February 11, 2008 is supported by the medical opinions of Drs. Carlson, Shih, Jones, the functional capacity assessment and clinical findings of Dr. Papenfuse and Lingenfelter, the neurological findings and objective MRI evidence of neurologist Dr. Jones, and the vocational opinions of Jan Cottrell despite Dr. Beasecker's disagreement. *See See Cox v.*

-50-

*Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009) ("[D]enial of benefits was not arbitrary and

capricious when, although the treating physician believed the claimant was 'totally disabled,' other

medical evidence indicated that the claimant could perform sedentary work.").; *Whitaker v. Hartford*

*Life & Accident Ins. Co.*, 404 F.3d 947, 950 (6th Cir. 2005) (holding that the administrator

reasonably relied on the opinions of consulting physicians who reviewed the medical records over

the opinions of the plaintiff's treating physician); *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161,

169 (6th Cir. 2003) ("Generally, when a plan administrator chooses to rely upon the medical opinion

of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits,

the plan administrator's decision cannot be said to have been arbitrary and capricious because it

would be possible to offer a reasoned explanation, based upon the evidence, for the plan

administrator's decision.").

  Standard also believes that Plaintiff incorrectly equates her Own Occupation as synonymous

with her job at Security First.  Plaintiff argues that Standard never evaluated her specific job

description at Security First, unreasonably relied on the DOT to determine the physical requirements

of her job, failed to consider whether she can work with "reasonable continuity," and distilled the

Plan's definition of disability into an inquiry of whether she can generally perform sedentary work.

Pl. Br. at 17, 19, 20. The Plan defines Own Occupation as "any" vocation "that involves the Material

Duties of the same general character as your regular and ordinary employment with the Employer."

Admin. Rec. 00604.   The Sixth Circuit has held that it is reasonable for an ERISA administrator to

use the DOT in determining a claimant's "own occupation." *Osborne v. Hartford Life & Accident*

*Ins. Co.*, 465 F.3d 296, 299 (6th Cir. 2006). The term Own Occupation "is sufficiently general and

flexible to justify determining a particular employee's 'occupation' in light of the position

descriptions in the Dictionary rather than examining in detail the specific duties the employee performed." *Osborne*, 465 F.3d at 299.

Standard did not narrow Plaintiff's Occupation into a single classification of "sedentary." Standard identified the specific physical demands required of an insurance customer service representative. Admin. Rec. 000801-802. Standard compared the physical demands of Plaintiff's Occupation with her clinically measured functional capacities, and reasonably concluded that she had the functional capacity to perform the material duties of her occupation. The functional capacity testing, and the opinions of Dr. Shih and Dr. Papenfuse based on the testing, corroborate Plaintiff's ability to sustain work-related activities during an eight-hour workday.

Standard agreed with Dr. Papenfuse that Plaintiff required an ergonomic sit-stand workstation to work in her Occupation. The Plan's Reasonable Accommodation Expense Benefit assures that a sit-stand workstation is possible for an employee where an employee asks for an accommodation. Under ERISA, an administrator vested with discretionary authority may consider workplace accommodations in determining whether an employee is totally disabled. *See Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 231 (5th Cir. 2004); *Donatiello v. Hartford Life & Accident Ins. Co.*, 344 F. Supp. 2d 575, 583 (E.D. Mich. 2004). Standard then determined that Plaintiff's need for ergonomic sit-stand workstation was not a totally disabling barrier preventing Plaintiff from working in her Own Occupation.

Plaintiff argues that Standard's administrative review was deficient, lamenting the lack of an independent medical examination ("IME") and Standard's reliance on consulting physicians who reviewed the medical file. There is nothing "inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d

286, 296 (6th Cir. 2005). The Sixth Circuit has never held that an administrator must undertake an IME before denying benefits. "Although [the Plan] provision allows [the administrator] to commission a physical examination of a claimant, there is nothing in the plan language that expressly bars a file review by a physician in lieu of such a physical exam." *Calvert*, 409 F.3d at 295 (emphasis in original); *see also McCandless*, 2011 WL 533590, at *11 (citing *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376 (6th Cir. 1996)). An IME was unnecessary in this case, because Standard and its consulting physiatrist, Dr. Shih, agreed with Dr. Papenfuse's assessment of Plaintiff's physical abilities and the results of functional capacity testing. Standard is not required to obtain an IME to perform repetitive tests when Standard relied on one of Plaintiff's treating physician's assessment and the functional capacity tests.

Plaintiff also contends that Standard disregarded her subjective complaints of pain. In evaluating Plaintiff's ability to work, Standard relied on Dr. Papenfuse's assessment of the functional capacity testing, which measured how much Plaintiff's pain limited her functional capabilities. Although subjective pain cannot be measured, "how much an individual's degree of pain or fatigue limits his functional capabilities … can be objectively measured." *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007); *accord Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 n.5 (1st Cir. 2003). ERISA plans would be open to fraudulent abuse if all that was needed to prevail and receive benefits was a claimant's subjective statement that she cannot work. *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1355 (M.D. Fla. 2004). In evaluating the functional capacity testing, Standard considered the impact of Plaintiff's subjective pain on her ability to work, and reasonably concluded she could work in her Own Occupation with the accommodation of an ergonomic workstation.

Plaintiff further believes that Standard's June 24, 2008, appellate determination letter was "premature" and that Dr. Shih failed to consider Dr. Papenfuse's letter identifying an ergonomic workstation as "something that would need to be done to accommodate her." Pl. Br. at 10-11. Standard's June 24, 2008 appellate determination, however, was not premature or rushed. On April 4, 2008, Standard provided Plaintiff with 45 days to submit additional medical records from Dr. Papenfuse, deferring its review until the records were received. Admin. Rec. 00685. Plaintiff rejected Standard's offer and insisted that Standard proceed with its review. Admin. Rec. 00682 (Plaintiff stating that she did "NOT want a deadline deferral"). Under ERISA, administrators must complete appellate reviews in 45 days after a request for review, or up to 90 days if additional time is needed Standard provided Plaintiff with additional time to submit medical evidence, and when Plaintiff declined to submit additional evidence, Standard proceeded to decide the appeal within the timeframe established by ERISA's regulations.

Finally, Standard notes that it provided Plaintiff with "exemplary" process by allowing a second administrative appeal more than seven months after Plaintiff exhausted her administrative remedies. When Standard decided Plaintiff's appeal on June 24, 2008, Plaintiff had exhausted her administrative remedies under ERISA and the terms of the Plan. Admin. Rec. 00649-656. Standard informed Plaintiff, "You are entitled to one independent review of your claim," "[w]e have completed that review," and "[t]his concludes the administrative review process by the Administrative Review Unit." Admin. Rec. 00656. More than seven months after exhausting her administrative remedies, on February 9, 2009, Plaintiff's attorney submitted new medical records and requested another appeal. Admin. Rec. 00588-589. Standard could have refused to review the additional records, and Standard's decision could have been reasonable. *See Huffaker v. Metro. Life*

-54-

*Ins. Co.*, 271 F. App'x 493, 499 (6th Cir. 2008) ("[The administrator] did not act arbitrarily in interpreting the Plan to permit only one appeal."); *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 483 (7th Cir. 2009) (holding that an administrator is not required to reopen the administrative record to review new evidence submitted after administrative remedies were exhausted).

Standard submits that its non-compulsory second review demonstrates unbiased claims administration. Plaintiff accuses Standard of misdirecting Dr. Shih's[5] attention to a non-existent medical record but Standard's medical referral asked whether Dr. Shih agreed with Dr. Papenfuse's assessment of Plaintiff's "ability to perform full time sedentary level work as of 2/12/08[.]" Admin. Rec. 00245. Plaintiff parenthetically comments, "[There is no assessment and conclusion by Dr. Papenfuse, of such date.]." Pl. Br. at 11. Plaintiff appears to be attempting to create the impression that February 12th refers to a non-existent medical record, when February 12th refers to the date by which Plaintiff was directed that she must establish total disability in order to remain covered under the Plan. Plaintiff's coverage under the Plan ended on February 12, 2008, because benefits ceased on February 11, 2008 and Plaintiff's employment terminated on February 8, 2008. Admin. Rec. 00729-33. Coverage under the Plan automatically ends on "[t]he date your employment terminates." Admin. Rec. 00617. To recover benefits, Plaintiff had to satisfy the "Own Occupation" definition of Disability as of February 12, 2008. *See, e.g.*, *Hall v. Life Ins. Co. of N. Am.*, 151 F. Supp. 2d 831, 835 (E.D. Mich. 2001) ("Under the terms of the plan at issue in this case, to establish eligibility for long-term disability benefits Plaintiff had to provide 'due proof' that she became totally disabled

---

[5]Plaintiff also contends that Dr. Shih's second review was erroneous because an administrator must consult a different physician on appeal than consulted during the initial claim evaluation. 29 C.F.R. § 2560.503-1(h)(3)(ii). Standard complied with this section by consulting Dr. Carlson for the initial claim evaluation and Dr. Shih for Plaintiff's appeal. ERISA does not require administrators who allow a voluntary second appeal to consult a third physician.

while insured for the long-term disability insurance."); *see also Likas v. Life Ins. Co. of N. Am.*, 347 F. App'x 162, 167-68 (6th Cir. 2009) ("Because plaintiff must show continuous disability and because coverage ends when a disability ends, any deterioration in health after the date coverage is denied is not relevant.").

## C.    Conclusions

Though Standard made its decision to deny Plaintiff's LTD claim under a structural conflict of interest, it does not follow that the Court should automatically reverse that decision. Plaintiff provides no evidence of Standard's rate of claims denials, no evidence that Standard based its decision on the costs associated with paying out her LTD claim, and no evidence that Standard portrayed Plaintiff in a negative light to the reviewing consultants, Drs. Carlson and Shih. *See, DeLisle v. Sun Life Assur. Co. of Canada*,  558 F.3d 440, 445 (6th Cir. 2009); *Cochran v. Trans-General Life Ins. Co.*, 12 F. App'x 277, 281 (6th Cir. 2001) ("mere allegations of the existence of a structural conflict of interest are not enough; there must be some evidence that the alleged conflict of interest affected the plan administrator's decision to deny benefits."). Notably, Standard appeared to consider all of the evidence that Plaintiff submitted. *See, Killian v. Healthsource Provident Adm'rs, Inc*., 152 F.3d 514, 521 (6th Cir.1998) (finding that a plan administrator was improperly influenced by a structural conflict of interest when it refused to consider evidence submitted by a claimant).  Standard also reviewed its denial of Plaintiff's LTD claim three times. The record provides no indication that the structural conflict of interest improperly influenced Standard's final decision.

Plaintiff also accuses Standard's medical consultants of prejudicial bias. Plaintiff believes that Dr. Shih had a "vested interest" in not changing the outcome of his prior decision in Plaintiff's

second appeal, and generally contends that both reviewing consultants demonstrated bias in their reports. Consulting physicians who are repeatedly retained by benefits plans "may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements." *Elliott v. Metro. Life Ins*., 473 F.3d 613, 620 (6th Cir. 2006) (internal quotations marks and citations omitted). However, the Supreme Court has explained that a claimant's treating physician may also have an incentive to make a finding of "disabled." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003). ERISA cases do not have a "treating physicians rule" which would require a plan administrator to accord a patient's treating physician's opinion special deference. *Id.* at 831-32. Relatedly, the Sixth Circuit has said that in order to support an allegation of plan-chosen reviewer bias, a party must provide statistical evidence that the reviewer consistently opined that claimants were not disabled. *Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005). Plaintiff has provided no such evidence.

As to Plaintiff's claims regarding the medical evidence, Standard explains it denied her claim because she failed to submit clinical exam findings and objective test results documenting specific function limitations to support a claim that her back pain prevented her from performing the "Material Duties" of her "Own Occupation." Indeed, Dr. Papenfuse opined that Plaintiff would be able to work at a full-time sedentary job, as is her Own Occupation, with an ergonomic assessment for a sit-stand workstation. The Plan provides for reimbursement for such a reasonable accommodation, but Plaintiff did not request one. Plaintiff did provide notice, albeit not a request, that an ergonomic assessment was recommended but did not do so until more than two months after Security First terminated Plaintiff's employment because they were no longer able to accommodate her part-time work restrictions. Standard had no duty to coordinate the purchase of the workstation

-57-

with Plaintiff's employer; under ERISA it was Plaintiff's responsibility to request the accommodation. Admin. Rec. 00245.

Standard also did not arbitrarily reject Dr. Beasecker's disability opinion nor capriciously review the available medical records.  Drs. Carlson and Shih's written opinions reflect that they were able to review Plaintiff's entire claim file and used adequate reasoning in coming to their conclusions, many of which are consistent with the findings of Plaintiff's treating doctors, Drs. Papenfuse and Jones. The available records support that Standard made a reasoned determination because, despite Plaintiff's reports of pain, Drs. Papenfuse and Jones both opined that the pain would not specifically limit or restrict Plaintiff's ability to perform full-time sedentary work with an ergonomic sit-stand workstation.

Plaintiff also objects to Standard's "file only review" of her claim. There is nothing "inherently objectionable about a file review by a qualified physician in the contest of a benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005); *see also, Bennett v. Kemper Nat. Services, Inc.*, 514 F.3d 547, 555 (6th Cir. 2008) (file reviewers should adequately explain why they reach decisions contrary to record evidence and if they rely on adverse credibility findings, explain why there is reason to doubt the applicant's credibility); *Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569 (7th Cir. 2006) ("In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation."). However, a "file only review" is a factor in the Court's review. *Smith v. Continental Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006).

-58-

Standard's initial letter notifying Plaintiff that her benefits were scheduled to end on February 11, 2008, was appropriate because Dr. Beasecker had advised Standard that Plaintiff's part-time work restriction would only be for six to eight weeks before she would be able to return to full time work. February 11, 2008, marked the outside limit of eight weeks of recovery time projected by Dr. Beasecker. *See Atkins v. Prudential Life Ins. Co.*, 404 F. App'x 82, 86 (8th Cir. 20101) (finding that an administrator reasonably terminated benefits when the initial award was for a fixed period of a short duration and emphasizing that it was not a case where the plan administrator found a claimant disabled for an extended duration and then overruled that decision years later). Upon being advised that Plaintiff was no longer working at Security First, Standard reconsidered its decision to close Plaintiff's LTD claim after February 11, 2008. Standard's May 9, 2008, letter to Plaintiff clearly explains the reasoning behind its decision to deny her claim. Standard provided a seven-page letter outlining the applicable policy provisions, as well as summarizing the medical records that had been provided for its review. Admin. Rec. 00665-71. Standard advised Plaintiff that, based on a review of these records, a physician consultant that is board certified in physiatry found that reasonable limitations and restrictions would be sedentary level work activities with no continuous bending, stooping, squatting, twisting or lifting. It also provides that a vocational review was conducted which explained that Plaintiff's Own Occupation is considered sedentary. As a result, Standard advised Plaintiff that despite Plaintiff's chronic low back pain, the medical records did not provide sufficient documentation of a condition of such severity as to prevent her from performing her Own Occupation after February 11, 2008.

Plaintiff was later sent an eight-page letter from a benefits review specialist, again reviewing the records submitted, the findings of the medical consultants, and upholding Standard's denial of

benefits. Admin. Rec. 00649-56. Standard's review of Plaintiff's first appeal was done in a timely manner, with the additional time to submit materials waived at Plaintiff's request.  Standard then sent a five-page letter on July 9, 2008, addressing Plaintiff's concerns and complaints, and explaining why Standard was upholding denial of her LTD claim. Admin. Rec. 00649-56. The denial letters provided by Standard on these three occasions adequately notified Plaintiff of the reasons for Standard's denial and the basis for its decision.

In this case, Standard's "file only review" was sufficient. As discussed above, Drs. Carlson and Shih explained why they disagreed with Dr. Beasecker's disability opinion, who was the sole treating doctor who opined that Plaintiff was fully disabled. They also had unrestricted access to the available medical records. Plaintiff nonetheless suggests that Standard should have ordered an independent physical exam. Though the Plan provides Standard that option, the Sixth Circuit has never held that a plan administrator must hire a physician to undertake an independent review of an applicant's records before denying benefits. *See Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376 (6th Cir. 1996); *see also Wages v. Sandler O'Neill & Partners, L.P.*, 37 F. App'x 108 (6th Cir. 2002). Plaintiff carried the burden of showing she was disabled under the Policy and her inability to do so can not be excused by arguing that Standard should have also ordered an independent exam. Furthermore, the Court need not respond to Plaintiff's varied arguments that the Administrative Record contains medical evidence that supports her claim because this case is not on de novo review.

### III

Accordingly, it is **ORDERED** that Security First's motion for summary judgment (ECF No. 32) is **GRANTED**.

It is further **ORDERED** that Plaintiff's motion for summary judgment (ECF No. 33) is **DENIED**.

It is further **ORDERED** that Standard Insurance Company's motion for judgment on the administrative record (ECF No. 38) is **GRANTED**.

It is further **ORDERED** that Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: February 9, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 9, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS

---